**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Raymond Edward Lumsden,

Plaintiff,

v.

Ramsey County Community Corrections Department; Joan Fabian,[1] individually and as Director of the Ramsey County Community Corrections Department; William McKee, individually and as Director of the Ramsey County Community Corrections Department Special/Intensive Supervision Program; Pat Kiland, individually and as Probation Officer for the Ramsey County Community Corrections Department; and Julie Paul, individually and as Probation Officer for the Ramsey County Community Corrections Department,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-2223 ADM/AJB

---

David L. Garelick, Esq., Larry Leventhal & Associates, Minneapolis, MN, appeared for and on behalf of Plaintiff.

Thomas E. Ring, Assistant County Attorney, St. Paul, MN, appeared for and on behalf of Defendants.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Court Judge pursuant to the Motion for Summary Judgment, or for Dismissal, or for Abstention from Exercise of Jurisdiction [Docket No. 28] of Defendants Ramsey County Community Corrections Department, Joan

[1] Defendant Joan Fabian, who is now Minnesota Commissioner of Corrections, is no longer Director of Ramsey County Community Corrections.

JAN 2 8 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JAN 2 8 2003
DEPUTY CLERK

Fabian, William McKee, Pat Kiland, and Julie Paul (collectively, "Defendants"). The parties presented oral arguments on September 25, 2002. For the reasons set forth below, Defendants' Motion is granted.

## II. BACKGROUND

The instant litigation arises from Plaintiff Raymond Edward Lumsden's ("Plaintiff") probation supervision by Ramsey County Community Corrections Department ("RCCC"). At the core of Plaintiff's suit is the claim that RCCC officials placed him in intensive probation, entailing more onerous conditions than those prescribed by the sentencing judge, in violation of the holding of State v. Henderson, 527 N.W.2d 827 (1995). Plaintiff argues his intensive probation resulted in a deprivation of substantive and procedural due process, as well as numerous other rights founded in state and federal law. The Complaint lists thirteen counts, ranging from violation of the right to travel and freedom of association, to assault and battery, to a request for an injunction. Since the filing of the Complaint, however, there has been some modification to this litany of charges; Plaintiff is no longer maintaining all the claims asserted in the Complaint.

The facts relevant to his current allegations require a review of Plaintiff's history with RCCC. After entering a guilty plea to two counts of felony harassment, Plaintiff was sentenced to a total of 72 months in the custody of the Minnesota Commissioner of Corrections. See Sentencing Tr. of 8/27/96 at 9-10 (Ring Aff. Ex. 8). The court stayed execution of this sentence and placed Plaintiff on probation for a term of up to 20 years. See id. at 10. The conditions of probation required Plaintiff:

(1) "complete a domestic abuse program as directed by [his] probation officer,"

> (2) "complete a mental health evaluation and follow the recommendations from that evaluation, again as directed by [his] probation officer," (3) abstain from mood-altering chemicals and submit to random urinalysis; (4) follow the recommendations of a chemical health assessment; (5) have no direct or indirect contact with the victim; (6) pay restitution and "otherwise follow the standard conditions of probation that [his] probation officer" would review with him, specifically demanding that Plaintiff "remain law abiding in all respects" and "report to [the] probation officer as directed," and (7) serve 170 days in a correctional facility.

Id. at 10-12. On September 11, 1996, Plaintiff signed a Probation Agreement with his assigned probation officer, Defendant Patricia Kiland ("Kiland"), listing the general and special conditions of Plaintiff's probation. See Probation Agreement of 9/11/96 (Ring Aff. Ex. 9). He signed an identical agreement with Defendant Julie Paul ("Paul") when she became his probation officer on February 10, 1997. See Probation Agreement of 2/10/97 (Ring Aff. Ex. 9). On this same date, he and Paul signed a second document entitled "Intensive Supervision Unit," which specified Plaintiff's placement on "intensive supervision" and set forth the additional conditions required of him, namely daily phone contact and a minimum of one face-to-face meeting per week with the probation officer. Intensive Supervision agreement (Ring Aff. Ex. 9). This agreement provided that the probation officer could contact Plaintiff in person at any time of day or night, on any day of the week, and could make "collateral contacts" with employers, counselors, and friends. Id. Paul transferred Plaintiff from intensive back to "regular supervision" shortly after February 17, 1999. See Paul Supervision Log, entry of 2/17/99 (Ring Aff. Ex. 22). Plaintiff claims his placement in intensive supervision violated the Minnesota Supreme Court edict

announced in Henderson and that the two years he spent under this level of probation led to infringement of various other legal rights.

In Henderson, the petitioner, a felon on probation, challenged his placement by RCCC in the Special Supervision Program ("SSP"), a former probation program that required, among other things, three in-person meetings per week, a 10:30 p.m. curfew, 24-hour accountability, and pre-approval for activities outside the home. See Henderson, 527 N.W.2d at 828. Citing these restrictive features, the Court held that under Minn. Stat. § 609.135 subd. 1(b), SSP was an "intermediate sanction," and therefore could only be imposed by the sentencing court, not by RCCC. Id. at 830. It articulated that while RCCC could properly determine and assign the appropriate *level* of probation, designation of "conditions of probation is exclusively a judicial function that cannot be delegated to executive agencies." Id. at 829 (emphasis added). Because under Minn. Stat. § 609.135 ordering intermediate sanctions is a condition rather than a level of probation, the court remanded the case to the sentencing court to establish conditions for the remainder of the petitioner's probation. Id. at 829-30. RCCC subsequently abolished SSP.

Plaintiff contends that RCCC's placement of him in the Intensive Supervision Unit and under conditions more onerous than those directed by the sentencing judge, without a court order specifying this assignment, violated the rule of Henderson. Accordingly, he argues, he suffered an abridgment of his procedural and substantive due process rights. Further, during Plaintiff's time on intensive supervision, he alleges that Paul violated his rights under the Fourth Amendment by taking blood and urine samples from him in his home, and impermissibly searching his residence.

## III. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that the court shall render summary judgment if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

Construing this rule, the United States Supreme Court stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Plaintiff's counsel stated at oral argument that all but Count I, the rights to travel and free association, and Count VIII, false arrest and imprisonment, remain viable. However, Plaintiff's memorandum does not defend or even address Counts IV, VII, IX, X, and XI, and provides no explanation of what conduct of the Defendants allegedly constituted such violations. In fact, Plaintiff's Memorandum in Opposition to Summary Judgment expressly states that he is only pursuing his Fourth Amendment and due process claims, for which he continues to seek punitive damages and injunctive relief. See Pl.'s Mem. at 16-35 ("Plaintiff will provide below the claims that he now intends to proceed on . . . "; then setting forth arguments for claims, citing only the Fourth and Fourteenth Amendments and decisions thereunder). Given this concession, the rule that a plaintiff at this procedural stage may not rest solely on allegations of the complaint, and the fact that Plaintiff has provided no indication of any evidence substantiating these claims, summary judgment is granted as to Counts I, IV, VII, VIII, IX, X, and XI. See Krenik v. County

of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (stating that a plaintiff confronted with a motion for summary judgment may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial"). The contested Counts are addressed below.

**A. Count V: § 1983 and Procedural Due Process**

This claim, based on Plaintiff's central theory that RCCC's direct placement of him in intensive supervision without a court order violated Minnesota law, is the foundation of Plaintiff's suit. Plaintiff baldly proclaims, "[c]learly the imposition of the additional conditions [of probation] . . . is an abridgement of his liberty." Pl.'s Mem. at 22. He argues, therefore, that, under the due process clause of the Fourteenth Amendment, he was entitled to notice, a hearing, and an order from the sentencing court before he was placed on intensive supervision. Defendants urge the Court to abstain from adjudication of this issue.

Plaintiff does not establish that this alleged contravention of state law necessarily entails an abridgment of due process, nor that this case belongs in federal court. Plaintiff's due process case rises and falls with his arguments regarding the propriety of RCCC's actions under Minnesota statute § 609.135, as construed in Henderson. The rules governing the interaction between the Ramsey County courts and the probation officials at RCCC are the province of the state judiciary and legislature and are not proper subjects for federal litigation and decision. As such, the Court will abstain from the exercise of jurisdiction over this claim.

The Pullman abstention doctrine provides that federal courts should refrain from deciding uncertain issues of state law where resolution at the state level would obviate the need for consideration of federal constitutional questions. Railroad Comm'n of Tex. v. Pullman, 312 U.S.

496, 499-501 (1941); see also Beavers v. Arkansas State Bd. of Dental Exam'rs, 151 F.3d 838, 841 (8th Cir. 1998). Exercise of this discretion is appropriate to further the public interest in "the avoidance of needless friction with state policies." Pullman, 312 U.S. at 500.

Analyzing the Pullman doctrine, the Eighth Circuit has enumerated five factors to be considered in determining whether or not to abstain from a suit. See Beavers, 151 F.3d at 841. The court must assess: "(1) the effect abstention would have on the rights to be protected by considering the nature of both the right and the necessary remedy; (2) available state remedies; (3) whether the challenged state law is unclear; (4) whether the challenged state law is fairly susceptible to an interpretation that would avoid any federal constitutional question; and (5) whether abstention will avoid unnecessary federal interference in state operations." Id. (citing George v. Parratt, 602 F.2d 818, 820-22 (8th Cir. 1979)).

Applying these considerations to the case at bar, abstention is proper. Plaintiff's asserted right to have modified, more burdensome probation conditions established by the sentencing court directly implicates the sensitive, purely state relationship between the state courts and state probation agencies. See Minn. Stat. § 383A.404 subds. 1, 5. Further, any injury Plaintiff suffered from the temporary imposition of additional probation conditions appears to be de minimis and "completely compensable by an award of money." George, 602 F.2d at 820. The natural consequences of providing a prospective remedy also favor state adjudication, because although Plaintiff requests monetary damages[2] and no "extraordinary relief," the ruling he seeks would necessitate reevaluation and restructuring of the relevant probation program and, more

[2] Although his Complaint also seeks injunction, this request is moot and is no longer a potential remedy. See infra part III.E.

globally, of the respective roles of the Ramsey County bench and RCCC; areas of state concern and expertise. Id.

With regard to state remedies, the Minnesota Rules of Criminal Procedure provide probationers with a right to return to the sentencing court for review and clarification of probation assignments and terms. See Minn. R. Crim. P. 27.03 subd. 4(E)(4). Plaintiff does not deny that he was aware of the availability of this procedure early on, and in fact sought relief from intensive supervision as part of a motion he brought before the sentencing judge in August 2000, to withdraw his plea or for alternative relief. See Order Denying Defendant's Motion for Relief of 11/20/00 at 2 (Ring Aff. Ex. 33). The Court ruled that because Lumsden was no longer subject to intensive supervision, the claim was moot. See id.

Third, the applicability of the state law under which Plaintiff asserts his rights is uncertain. Despite Plaintiff's argument that the Henderson decision is clearly established law, such that abstention is unwarranted, the issue presented is unclear because of remaining uncertainty regarding what constitutes an "intermediate sanction" within the meaning of Henderson and the referenced statute, Minn. Stat. § 609.135 subd. 1. It is uncontested that Plaintiff was assigned for a period of his probation to the "Intensive Supervision Unit," but whether or not this level of surveillance amounts to an intermediate sanction has not been considered.[3] The particular probation program at issue in Henderson, SSP, is no longer in

---

[3] Defendants only briefly acknowledge the Intensive Supervision agreement, deeming it merely an "informational document." On its face, this paper imposes greater requirements on Plaintiff than the conditions listed by the sentencing judge and those recited on Plaintiff's standard Probation Agreement signed September 11, 1996. See Intensive Supervision agreement; Probation Agreement of 9/11/96 (Ring Aff. Ex. 9). However, the issue of whether or not this degree of restriction and supervision amounted to "intermediate sanctions" within the meaning of Minnesota statutory law should not be resolved by a federal court with no

existence and was never applied to Plaintiff. The conditions of this former sanction were more restrictive than those of the "Intensive Supervision Unit," and RCCC, after discussion with Ramsey County district judges, specifically eliminated certain requirements of SSP to comply with the Henderson ruling. See McKee Dep. Exs. 9, 10 (Ring Aff. Ex. 4). Defendants concede that from February 10, 1997, to on or about February 17, 1999, Plaintiff was subject to the highest administrative level of probation, termed interchangeably "surveillance" or "intensive" level.[4] The statute addressed in Henderson explicitly cites "intensive probation" as an "intermediate sanction" to be imposed only by the sentencing court. See Minn. Stat. § 609.135 subd. 1(b); Henderson, 527 N.W.2d at 829 (expressing that an RCCC official characterized SSP as intensive probation). This common terminology, however, is not determinative, because it remains unclear what amount or degree of restrictions will constitute "intensive probation," as interpreted not in an administrative context, but by the Minnesota courts.[5] Without such a clarifying construction from the state judiciary the law remains uncertain. In this specialized field of state law, this Court is reluctant to impose a purely textual analysis based solely on a single opinion involving different facts and circumstances.

---

involvement in the operation of the state probation system.

[4] Defendants submit that this supervision level had been approved by the Ramsey County courts and in use since the 1980s. Of course, judicial approval is not conclusive, as evidenced by the fact that the Ramsey County bench had also approved the probation program struck down in Henderson, but it does reflect the collaborative nature of the process and the imprecise line between conditions and levels of probation. See Henderson, 527 N.W.2d at 828.

[5] According to Defendants, RCCC's use of "intensive" as a synonym for "surveillance" level probation occurred as an accident of physical proximity to state programs, having no relation to probation, bearing titles that included the word "intensive." See Def.'s Mem. at 4 n.3 (citing McKee Dep. at 3-4, 44, Ex. 13 (Ring Aff. Ex. 4)).

Turning to the fourth Pullman factor, a state court ruling that Plaintiff's probation modification was proper under state law completely eliminates his procedural due process claim, which is based on the contention that the alleged violation of state law simultaneously abridged his constitutional right to due process. As such, an interpretation of the application of Minn. Stat. § 609.135 subd. 1 to the facts of this case finding Plaintiff's supervision was not an "intermediate sanction" would avoid needless consideration of federal issues. See George, at 822.

Lastly, and most fundamentally in this case, abstention is important to prevent "federal interference in state operations." Beavers, 151 F.3d at 841. Implicit throughout this abstention analysis is the concern that directing what a state agency may and may not properly do under state law would contravene the tenets of federalism and comity and have little basis in law or fact, especially in light of the sparse record on this issue. Deference to the expertise and familiarity of the state bench in such matters of particular state interest is appropriate. Accordingly, the Court will abstain from the exercise of jurisdiction over Plaintiff's central allegations of violation of Minnesota law and the attendant procedural due process claim.[6]

[6] Even if the Court were to reach a decision on the merits of this claim, it is not clear that the rule of Henderson would provide the legal support Plaintiff seeks because of significant factual differences between the conditions of Plaintiff's probation and those of Henderson. Henderson was sentenced to 36 months imprisonment, with execution of this sentence stayed on the conditions that Henderson serve one year in the workhouse, pay restitution, complete a Rule 25 assessment and any recommended treatment, and avoid the neighborhood where the assault for which he was convicted occurred. Henderson, 527 N.W.2d at 827-28. Unlike the conditions imposed at Plaintiff's sentencing, these requirements were narrowly tailored and included no language broad enough to cover the restrictive meetings, curfew, and accountability features of SSP. Id. at 828. By contrast, the court explicitly included in Plaintiff's sentence the requirement that he "follow the standard conditions of probation *that your probation officer will review with you . . . and that you report to your probation officer as directed.*" Sentencing Tr. of 8/27/96 at 12 (Ring Aff. Ex. 8) (emphasis added). This expansive order provides RCCC with greater

In contrast, the claimed violations of Plaintiff's Fourth Amendment rights are distinct from the allegations involved in his due process claim. Their resolution is not directly tied to the asserted violation of Henderson, and therefore they must be dealt with separately despite abstention from the state-law based claim. Similarly, his substantive due process claim, while premised on the conditions of intensive supervision, may be addressed without regard to the propriety of Defendants' actions under state law.

**D. Counts II and III: § 1983 and the Fourth Amendment**

Plaintiff argues that searches of his home, blood, and urine on various occasions were unreasonable and therefore in violation of the Fourth Amendment. He claims Paul came to his home without prior warning and conducted a search, including emptying the garbage onto the counter. Further, Plaintiff asserts Paul collected his urine samples from him at his home multiple times, even accompanying him into the bathroom and personally holding the specimen cup. Regarding the search or seizure[7] of his blood, Plaintiff alleges Paul brought a woman phlebotomist to his home who drew his blood to test for steroid use. Though he does not recall the phlebotomist's name nor what she looked like, Plaintiff's mother and sister corroborate his allegations in their deposition testimony describing the event. Plaintiff claims that only Paul is responsible for these alleged invasions and provides witness testimony of his mother and sister to

---

discretion and encompasses many more probation possibilities than did Henderson's sentence. Given these important factual distinctions, the applicability of the Henderson decision to Plaintiff's case is questionable.

[7] Plaintiff's Complaint sets forth separate counts for "search" and "seizure." Because all alleged violations may be construed as searches under Fourth Amendment precedent, and the result on these claims does not depend on the characterization of the government conduct, these Counts will be addressed as one.

support his assertions. Paul denies all such allegations and submits that all urine testing occurred at her office. Similarly, Defendant William McKee ("McKee"), Paul's supervisor, states that RCCC has never taken blood tests and does not collect urine samples "in the field," outside of the laboratory. See McKee Dep. at 71, 72 (Ring Aff. Ex. 4).

The Fourth Amendment is violated when an agent of the government conducts a search or seizure that is unreasonable. U.S. Const. amend. IV. Thus, the threshold question is whether or not a search or seizure has taken place. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 618-19 (1989). Reasonableness must then be assessed, based on the circumstances of the particular search or seizure. Id. at 619. The Supreme Court has held that blood and urine tests are deemed searches for purposes of the Fourth Amendment. Id. 489 U.S. at 616-17. It has further found such searches to be minimally intrusive and reasonable if justified by special needs not present in normal law enforcement. Id. at 620, 628, 633. Plaintiff acknowledges that the nature of the probation system permits a greater intrusion into the privacy of probationers than would be acceptable for "the public at large." Griffin v. Wisconsin, 483 U.S. 868, 875 (1987).

### 1. Qualified Immunity

Defendants, however, contend that the Court need not reach the issue of reasonableness because Paul is shielded by qualified immunity. Qualified immunity protects public officials from suit unless the alleged conduct of such official "violated 'clearly established statutory or constitutional rights.'" Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir. 1998). In determining the applicability of qualified immunity, the court assesses whether or not the plaintiff has claimed deprivation of a constitutional right, and if so, "whether that right was clearly established at the time of the alleged violation." Pace v. City of Des Moines, 201 F.3d

1050, 1055 (8th Cir. 2000) (internal quotation omitted). "To be 'clearly established,' the contours of the right 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Turner v. Arkansas Ins. Dept., 297 F.3d 751, 755 (8th Cir. 2002) (quoting Anderson v. Creighton, 483 U.S. 635 (1987)). If the unlawfulness would have been apparent to a reasonable public official, in light of pre-existing law, immunity does not apply. Id. It is the plaintiff's burden to show that the asserted right was clearly established. Davis v. Scherer, 468 U.S. 183, 197 (1984); see also Tyler v. Barton, 901 F.2d 689, 691 (8th Cir. 1990).

With respect to the alleged searches of Plaintiff's home, blood, and urine, summary judgment is appropriate in light of Paul's qualified immunity. Even assuming such searches did in fact transpire and were unreasonable, and thus in violation of the Fourth Amendment, Plaintiff has not shown that these actions amount to violations of clearly established rights, given the circumstances of the alleged occurrences and the lower level of privacy afforded those on probation.

**a. Search of Home**

Assuming Paul searched Plaintiff's home as alleged, despite Plaintiff and his wife's inability to specify any date these searches occurred, such action would not violate a clearly established right.[8] Probation entails a significant restriction on liberty that lessens the degree of constitutional protections one would otherwise be entitled to. Griffin, 483 U.S. at 874, 875. The

[8] Amanda Lumsden, Plaintiff's wife, recalls a single incident of a search and Plaintiff's sister and mother have no knowledge of any searches. See A. Lumsden Dep. vol. 2 at 76-79 (Ring Aff. Ex. 18); R. Oltmans Dep. at 48 (Ring Aff. Ex. 19); A. Oltmans Dep. at 37 (Ring Aff. Ex. 16).

sanction, safety, and rehabilitative purposes of probation create "special needs" of the government that permit increased intrusion into the freedom and privacy of probationers, such that neither a warrant nor probable cause are absolutely necessary for a search of the home. Id. at 873-74, 876; United States v. Vincent, 167 F.3d 428, 430 (8th Cir. 1999). Accordingly, even if a search of Plaintiff's home without a warrant would violate his Fourth Amendment rights, under the circumstances of his probation and the governing law, such right would not be so clearly established as to deprive Paul of immunity. See generally United States v. Duff, 831 F.2d 176, 179 (9th Cir. 1987) (reasonable suspicion and the belief that a search is necessary to performance of probation officer's duties sufficient to justify search). The purported search must be evaluated against the factual backdrop that Paul had learned from the Spring to the Fall of 1997 that Plaintiff had consumed alcohol, had friends using drugs and drinking excessively, and had attempted to sell guns to another individual. See Paul Supervision Log, entries of 4/16/97, 5/12/97, 6/18/97, 10/6/97 (Ring Aff. Ex. 22). Such grounds for suspicion may render a warrantless search reasonable under the law of at least one Circuit, indicating Paul would not have known she was violating a clearly established right. See Duff, 831 F.2d at 179. Plaintiff offers no support for his conclusory contention that Paul knew or should have known she was violating his rights.

**b. Blood Test**

As noted above, blood tests have been upheld by the Supreme Court as a constitutional means of furthering important government interests. Skinner, 489 U.S. at 633. In Skinner, analogizing the government interest in ensuring safety in operation of the railways to the "special needs" presented by, among other things, the "supervision of probationers," the Court upheld

warrantless blood, breath, and urine tests of railroad employees, even absent particularized suspicion. Id. at 620, 633. Following the Supreme Court's balancing approach in Skinner, the Fourth Circuit has stated that testing a person's blood may be a reasonable search if valid government interests outweigh such an intrusion. Jones v. Murray, 962 F.2d 302, 307 (4th Cir. 1992). Plaintiff's admitted use of steroids in the past and his probation condition requiring abstention from mood-altering chemicals arguably provide the individualized suspicion necessary to meet the higher threshold of reasonableness applied to free society, as opposed to convicted felons. See Ryncarz v. Eikenberry, 824 F. Supp. 1493, 1499 (E.D. Wa. 1993) (stating that drawing blood from a free person would require personal suspicion, whereas such search of a convicted felon would demand showing only "some legitimate penological interest"). Given this state of the law, even if Plaintiff could prove the blood tests in fact occurred at the direction of Paul, Paul is entitled to qualified immunity because the right of a probationer to be free from blood testing for suspected drug or alcohol use is not clearly established. See Jones, 962 F.2d at 307.

**c. Urine Samples**

The allegations that Paul accompanied Plaintiff into the bathroom in his home to collect urine samples pose a more troubling question. Paul wholly denies these averments and states that all urinalysis took place at the laboratory. Despite Defendants' adamant arguments that much if not all of Plaintiff's allegations are founded on fabrication, Plaintiff has come forth with some corroborating evidence minimally sufficient to withstand summary judgment, and such an invasion of privacy, if it indeed transpired, would test the bounds of immunity. However, given the varying standards and opinions in this area of law, the Court finds that Paul is entitled to

qualified immunity on this claim. See Tyler, 901 F.2d at 691 (holding parole officers entitled to qualified immunity in § 1983 action based on visual monitoring of parolee providing urine sample).

Individuals have a Fourth Amendment right to privacy that protects from government intrusion portions of the body not openly exposed to public view. See Hill v. McKinney, 311 F.3d 899, 903-04 (8th Cir. 2002) (placing naked female prisoner on restraint board violated Fourth Amendment right to privacy, but violation was not so clearly established as to deprive defendants of qualified immunity). As discussed repeatedly above, the protections of the Fourth Amendment do not apply with full force to those convicted of crimes and serving probation. Tyler, 901 F.2d 689, 691. Random urine tests were an explicit condition of Plaintiff's probation. See Probation Agreement para. 3 ("Submit to random UA's per the probation officer."); Intensive Supervision agreement (Ring Aff. Ex. 9). Furthermore, direct observation of urine testing has been upheld as permissible under the Fourth Amendment in limited circumstances involving decreased expectations of privacy and legitimate government need or justification. See, e.g., American Fed'n of Gov't Employees, Local 1533 v. Cheney, 754 F. Supp. 1409, 1427 (N.D. Cal. 1990), aff'd, 944 F.2d 503 (9th Cir. 1991) (upholding Navy drug screening policy that permitted observation where reasonable suspicion of tampering existed); Storms v. Caughlin, 600 F. Supp. 1214, 1220 (S.D.N.Y. 1984) (finding that Fourth Amendment did not necessarily bar drug testing procedure in which prison official held bottle while inmate supplied his sample). While this method of urine collection is not encouraged, the right of a probationer to be free of direct observation of urine sampling is not so clearly defined as to necessitate that Paul would have known that in-person collection of the specimen violated Plaintiff's Fourth Amendment

rights. Compare Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir. 1992) (holding that qualified immunity did not apply to male officer who entered bathroom stall while female plaintiff parolee was supplying urine specimen) with Tyler, 901 F.2d 689, 691 (where drug testing was a condition of plaintiff's parole, defendant's presence and observation while sample furnished did not violate a clearly established right).

In consideration of the express probation condition mandating Plaintiff subject himself to random testing at the behest of his probation officer and the cases allowing observation of the provision of such samples, even outside the criminal justice context, Plaintiff's privacy right is not so clearly established as to defeat qualified immunity. See Tyler, 901 F.2d at 690, 691; Hansen v. California Dept. of Corrs., 920 F. Supp. 1480, 1487-1500 (N.D. Cal. 1996) (after extensive review of case law, applying qualified immunity to direct observation of urine testing). Pursuant to the above findings, summary judgment is granted as to all Defendants[9] on Counts II and III, Plaintiff's Fourth Amendment claims.

**C. Count VI: Substantive Due Process**

Plaintiff claims Defendants violated his substantive due process rights by assigning him to a level of supervision that required more onerous conditions, such as daily telephone contact and weekly meetings, than those imposed at sentencing. Defendants counter that the assignment

---

[9] Plaintiff broadly states that Defendants RCCC, Fabian, and McKee are liable for all his § 1983 claims, without differentiation. However, he appears to assert his Fourth Amendment claims only against Paul. In any event, he provides no proof or even factual basis for argument that the other Defendants knew of, or were deliberately indifferent to, the alleged unlawful behavior by Paul, and acknowledges that they cannot be held liable for § 1983 violations under a theory of respondeat superior. See Monell v. Department of Social Servs., 436 U.S. 658, 691 (1978); Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989). Accordingly, in addition to Paul, summary judgment is appropriate in favor of Defendants RCCC, Fabian, McKee, and Kiland.

of Plaintiff to a particular level of probation implicated no constitutional issues, particularly none as egregious as infringement of substantive due process.

While Plaintiff's felony conviction and status as a probationer limit the extent of liberty he may claim, he remains entitled to "conditional liberty properly dependant upon observance" of the restrictions of his probation. Griffin, 483 U.S. at 874 (quoting Morrisey v. Brewer, 408 U.S. 471, 480 (1972)). Assertion of a substantive due process claim, however, is generally reserved for government abuses that "shock the conscience and violate the decencies of a civilized society." Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (citing County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

Apparently merging his substantive and procedural due process arguments, Plaintiff alleges only that he was entitled to "actual notice of [the additional obligations]" required of him under intensive probation and a hearing prior to their imposition. Pl.'s Mem. at 22-23. His primary contention again boils down to his fundamental complaint that RCCC placed him under more intensive supervision than that prescribed by the sentencing court, in violation of Minnesota law.

Plaintiff offers no explicit argument nor even an intimation of how these purported unlawful additional requirements rise to the level of "the most egregious official conduct" necessary to substantiate this type of claim. Lewis, 523 U.S. 846-47; see also Smithson v. Aldrich, 235 F.3d 1058, 1063 (8th Cir. 2000). As a matter of law, the telephone check-ins and weekly in-person meetings mandated by the Intensive Supervision agreement do not approach the type of government action proscribed by the substantive protection of the due process clause. Cf. Rochin v. California, 342 U.S. 165, 172 (1952) (ruling that "forcible extraction of [plaintiff's]

stomach's contents" is violative of substantive due process). This is particularly so in light of Plaintiff's status as a felon serving his punishment not in a prison cell, but through the alternative of probation, the very circumstances of which he now complains. Summary judgment on this claim is granted.

**D. Count XII: Punitive Damages**

The claim for punitive damages is obviously dependent upon Plaintiff's success in proving a violation of his rights.[10] Accordingly, the above holding of abstention as to the procedural due process claim, itself depending on resolution of state issues, is equally applicable to the request for monetary relief.

**E. Count XIII: Injunctive Relief**

Plaintiff's Complaint further states a claim for injunctive relief to prohibit Defendants from subjecting him to the terms of "Special Supervision" probation. Compl. ¶ 67. He fails, however, to address Defendants' contention that this claim is moot, as Plaintiff was never assigned to "Special Supervision," the sanction at issue in Henderson, and was removed from intensive supervision in 1999. It is the assignment to and conditions of this level of probation Plaintiff seeks to enjoin, and without some assertion or evidence that he is still under intensive or "surveillance" supervision, this claim is moot. Accordingly, summary judgment is granted in favor of defendants on Count XIII of the Complaint. See Martin v. Sargent, 780 F2d 1334, 1337 (8th Cir. 1985) (holding prisoner's request for injunction moot when no longer subject to

---

[10] To obtain this type of damages Plaintiff must prove Defendants acted with reckless or callous indifference to his rights. Brewer v. Chauvin, 938 F.2d 860, 864 (8th Cir. 1981). Further, in procedural due process cases, even compensatory damages require a showing of actual injury. Carey v. Piphus, 435 U.S. 247, 264 (1978).

complained-of condition).

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 28] is **GRANTED** on Counts I, II, III, IV, VI, VII, VIII, IX, X, XI, and XIII;

2. Defendants' Motion for Abstention from Exercise of Jurisdiction [Docket No. 28] is **GRANTED** on Counts V and XII; and

3. Plaintiff's Complaint [Docket No. 1] is **DISMISSED** without prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: January 28, 2003

# UNITED STATES DISTRICT COURT
## District of Minnesota

| | | |
|---|---|---|
| 700 Federal Building<br>316 North Robert Street<br>St. Paul, MN 55101 | 202 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, MN 55415 | 417 Federal Building<br>515 West First Street<br>Duluth, MN 55802 |

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.